AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| In the Matter of the Search of | |
|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) ) |
| INFORMATION ASSOCIATED WITH TWO ACCOUNTS STORED AT PREMISES CONTROLLED BY FACEBOOK, INC., PURSUANT TO 18 U.S.C. 2703, FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. § 231(a)(3), ET AL. | ) ) ) ) |

Case No. 21-SC-249

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 231(a)(3) | - Obstructing or Impeding Any Law Enforcement Officer |
| 18 U.S.C. § 1752(a)(1) and (2) | - Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority |
| 40 U.S.C. § 5104(e)(2)(D) and (G) | - Violent Entry and Disorderly Conduct on Capitol Grounds |

The application is based on these facts:

SEE AFFIDAVIT

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Michael Attard, Special Agent, FBI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____Telephone_____ *(specify reliable electronic means).*

Date:  _____01/24/2021_____

_____
*Judge's signature*

City and state:  __Washington, D.C.__          G. Michael Harvey, United States Magistrate Judge
_____
*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means          ☑ Original          ❑ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.  21-SC-249 |
| INFORMATION ASSOCIATED WITH TWO ACCOUNTS STORED AT | ) | |
| PREMISES CONTROLLED BY FACEBOOK, INC., PURSUANT TO 18 | ) | |
| U.S.C. 2703, FOR INVESTIGATION OF VIOLATION OF | ) | |
| 18 U.S.C. § 231(a)(3), ET AL. | ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Northern_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

**YOU ARE COMMANDED** to execute this warrant on or before _____February 6, 2021_____ *(not to exceed 14 days)*
❑ in the daytime 6:00 a.m. to 10:00 p.m.  ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____G. Michael Harvey_____.
*(United States Magistrate Judge)*

❑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❑ for _____ days *(not to exceed 30)*  ❑ until, the facts justifying, the later specific date of _____.

Date and time issued:  ___01/24/2021___

City and state:  __Washington, D.C.__                    _____G. Michael Harvey, United States Magistrate Judge_____
                                                                                        *Judge's signature*
                                                                                        G. Michael Harvey, United States Magistrate Judge
                                                                                        *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br> 21-SC-249 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**
**Property to Be Searched**

This warrant applies to information, which is associated with the Facebook, Inc. accounts identified by "Facebook.com/sam.camargo.7" ("CAMARGO'S FACEBOOK ACCOUNT") and "Skilils" (hereinafter, "CAMARGO'S INSTAGRAM ACCOUNT"), and which is stored at premises owned, maintained, controlled, or operated by Facebook, Inc., a company that accepts service of legal process at 1601 Willow Road, Menlo Park, California.

<u>**ATTACHMENT B**</u>

**Particular Things to be Seized and Procedures
to Facilitate Execution of the Warrant**

**I.     Information to be disclosed by Facebook, Inc. ("PROVIDER") to facilitate
execution of the warrant**

To the extent that the information described in Attachment A is within the possession,

custody, or control of PROVIDER, regardless of whether such information is located within or

outside of the United States, and including any emails, records, files, logs, or information that

has been deleted but is still available to PROVIDER, or has been preserved pursuant to a request

made under 18 U.S.C. § 2703(f) on January 8, 2021, PROVIDER is required to disclose the

following information to the government for each account or identifier listed in Attachment A:

A.     All business records and subscriber information, in any form kept, pertaining to
the Account, including:

1.     Identity and contact information (past and current), including full name, e-
mail addresses, physical address, date of birth, phone numbers, gender,
hometown, occupation, websites, and other personal identifiers;

2.     All Facebook usernames (past and current) and the date and time each
username was active, all associated Instagram and other Facebook
accounts (including those linked by machine cookie), and all records or
other information about connections with Facebook, third-party websites,
and mobile apps (whether active, expired, or removed);

3.     All Instagram usernames (past and current) and the date and time each
username was active, all associated Instagram and Facebook accounts
(including those linked by machine cookie), and all records or other
information about connections with Instagram, third-party websites, and
mobile apps (whether active, expired, or removed);

4.     Length of service (including start date), types of services utilized,
purchases, and means and sources of payment (including any credit card
or bank account number) and billing records;

5.     Devices used to login to or access the account, including all device
identifiers, attributes, user agent strings, and information about networks
and connections, cookies, operating systems, and apps and web browsers;

6.      All advertising information, including advertising IDs, ad activity, and ad topic preferences;

7.      Internet Protocol ("IP") addresses used to create, login, and use the account, including associated dates, times, and port numbers, **from January 1, 2021, to January 20, 2021**;

8.      Privacy and account settings, including change history; and

9.      Communications between PROVIDER and any person regarding the Account, including contacts with support services and records of actions taken;

B.      All content (whether created, uploaded, or shared by or with the Account), records, and other information relating to videos (including Facebook Live videos and videos on IGTV), images, stories and archived stories, past and current bios and profiles, posts and archived posts, captions, tags, nametags, comments, mentions, likes, follows, followed hashtags, shares, invitations, and all associated logs and metadata, **from January 1, 2021, to January 20, 2021**;

C.      All content, records, and other information relating to communications sent from or received by the Account **from January 1, 2021, to January 20, 2021**, including but not limited to:

1.      The content of all communications sent from or received by the Account, including direct and group messages, and all associated multimedia and metadata, including deleted and draft content if available;

2.      All records and other information about direct, group, and disappearing messages sent from or received by the Account, including dates and times, methods, sources and destinations (including usernames and account numbers), and status (such as delivered, opened, replayed, screenshot);

3.      All records and other information about group conversations and video chats, including dates and times, durations, invitations, and participants (including usernames, account numbers, and date and time of entry and exit); and

4.      All associated logs and metadata;

D.      All content, records, and other information relating to all other interactions between the Account and other Instagram users **from January 1, 2021, to January 20, 2021**, including but not limited to:

1.      Interactions by other Facebook or Instagram users with the Account or its content, including posts, comments, likes, tags, follows (including unfollows, approved and denied follow requests, and blocks and unblocks), shares, invitations, and mentions;

2.      All users the account has followed (including the close friends list), unfollowed, blocked, unblocked, muted, restricted, or denied a request to follow, and of users who have followed, unfollowed, blocked, unblocked, muted, restricted, or denied a request to follow the account;

3.      All contacts and related sync information; and

4.      All associated logs and metadata;

E.      All records of searches performed by the account **from January 1, 2021, to January 20, 2021**; and

F.      All location information, including location history, login activity, information geotags, and related metadata **from January 1, 2021, to January 20, 2021**.

PROVIDER is hereby ordered to disclose the above information to the government within **14 days** of issuance of this warrant.

## II.      Information to be seized by the government

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. §§ 231(a)(3) (Civil Disorder), 1752(a)(1) & (2) (Knowingly Entering or Remaining in any Restricted building or Grounds without Lawful Authority; Knowingly Engaging in Disorderly or Disruptive Conduct in any Restricted Building or Grounds), and 40 U.S.C. § 5104(e)(2) (Violent Entry and Disorderly Conduct on Capitol Grounds) (collectively, the "Subject Offenses"), those violations involving **SAMUEL CAMARGO** and occurring on approximately January 6, 2021, including, for each Account or identifier listed on Attachment A, information pertaining to the following matters:

(a) Evidence of any preparation or planning by CAMARGO related to protesting the certification of the Electoral College of the 2020 Presidential Election;

(b) Evidence indicating how and when the Facebook and Instagram accounts were accessed or used, to determine the geographic and chronological context of

account access, use, and events relating to the crime under investigation and to the Facebook/Instagram account owner;

(c) Evidence indicating the Facebook/Instagram account owner's state of mind as it relates to the crimes under investigation;

(d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

### III.    Government procedures for warrant execution

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II. That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court. Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH TWO ACCOUNTS STORED AT PREMISES CONTROLLED BY FACEBOOK, INC., PURSUANT TO 18 U.S.C. 2703, FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. § 231(a)(3), ET AL.** | **Case No. 21-SC-249**  <br><br> <u>**Filed Under Seal**</u> |

*Reference:    USAO Ref. #2021R00257 & 2021R00162; Subject Accounts: Facebook Account Identifier: "Facebook.com/sam.camargo.7"; Instagram Account Identifier: "Skilils"*

**AFFIDAVIT IN SUPPORT OF**
**<u>AN APPLICATION FOR A SEARCH WARRANT</u>**

I, Michael Attard, being first duly sworn, hereby depose and state as follows:

**<u>INTRODUCTION AND AGENT BACKGROUND</u>**

1.      I make this affidavit in support of an application for a warrant to search information associated with two accounts maintained by Facebook, Inc. ("PROVIDER"): "Facebook.com/sam.camargo.7" (hereinafter, "CAMARGO'S FACEBOOK ACCOUNT") and "Skilils" (hereinafter, "CAMARGO'S INSTAGRAM ACCOUNT"). PROVIDER is an electronic communication services provider and/or remote computing services provider, which is headquartered and accepts service at 1601 Willow Road, Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require PROVIDER to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons

will review that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.

2.      I am a special agent with the Federal Bureau of Investigation ("FBI"). I have been in this position since 2005. I am currently assigned to a counter-terrorism squad at the Washington, D.C. field office. During my 15-year career, I have investigated various types of crimes, including white collar crime, violent crime associated with gang activity, and foreign and domestic terrorism-related crime.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that Samuel Camargo ("CAMARGO") has violated 18 U.S.C. §§ 231(a)(3) (Civil Disorder), 1752(a)(1) & (2) (Knowingly Entering or Remaining in any Restricted building or Grounds without Lawful Authority; Knowingly Engaging in Disorderly or Disruptive Conduct in any Restricted Building or Grounds), and 40 U.S.C. § 5104(e)(2) (Violent Entry and Disorderly Conduct on Capitol Grounds) (collectively, the "Subject Offenses"). There is also probable cause to search the information described in Attachment A for evidence further described in Attachment B.

## JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that—has jurisdiction

over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, DC. *See* 18 U.S.C. § 3237.

## PROBABLE CAUSE

### *Background Related to Events at the U.S. Capitol on January 6, 2021*

6.  United States Capitol Police ("USCP"), the FBI, and assisting law enforcement agencies are investigating a riot and related offenses that occurred at the United States Capitol Building, located at 1 First Street, NW, Washington, D.C., 20510, at latitude 38.88997 and longitude -77.00906, on January 6, 2021.

7.  At the U.S. Capitol, the building itself has 540 rooms covering 175,170 square feet of ground, roughly four acres. The building is 751 feet long (roughly 228 meters) from north to south and 350 feet wide (106 meters) at its widest point. The U.S. Capitol Visitor Center is 580,000 square feet and is located underground on the east side of the Capitol. On the west side of the Capitol building is the West Front, which includes the inaugural stage scaffolding, a variety of open concrete spaces, a fountain surrounded by a walkway, two broad staircases, and multiple terraces at each floor. On the East Front are three staircases, porticos on both the House and Senate side, and two large skylights into the Visitor's Center surrounded by a concrete parkway. All of this area was barricaded and off limits to the public on January 6, 2021.

8.  The U.S. Capitol is secured 24 hours a day by USCP. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

9.  On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

10.     On January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the U.S. Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which took place on November 3, 2020 ("Certification"). The joint session began at approximately 1:00 p.m. Eastern Standard Time (EST). Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

11.     As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and USCP were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

12.     At around 1:00 p.m. EST, known and unknown individuals broke through the police lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP and supporting law enforcement officers there to protect the U.S. Capitol.

13.     At around 1:30 p.m. EST, USCP ordered Congressional staff to evacuate the House Cannon Office Building and the Library of Congress James Madison Memorial Building in part because of a suspicious package found nearby. Pipe bombs were later found near both the Democratic National Committee and Republican National Committee headquarters.

14.     Media reporting showed a group of individuals outside of the Capitol chanting, "Hang Mike Pence." I know from this investigation that some individuals believed that Vice

President Pence possessed the ability to prevent the certification of the presidential election and that his failure to do so made him a traitor.

15.    At approximately 2:00 p.m., some people in the crowd forced their way through, up, and over the barricades and law enforcement. The crowd advanced to the exterior façade of the building. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials. At such time, the certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of law enforcement attempted to maintain order and keep the crowd from entering the Capitol.

16.    Shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. Publicly available video footage shows an unknown individual saying to a crowd outside the Capitol building, "We're gonna fucking take this," which your affiant believes was a reference to "taking" the U.S. Capitol.



17.     Shortly thereafter, at approximately 2:20 p.m. members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers. That is, at or about this time, USCP ordered all nearby staff, Senators, and reporters into the Senate chamber and locked it down. USCP ordered a similar lockdown in the House chamber. As the subjects attempted to break into the House chamber, by breaking the windows on the chamber door, law enforcement was forced to draw their weapons to protect the victims sheltering inside.

18.     At approximately 2:30 p.m. EST, known and unknown subjects broke windows and pushed past USCP and supporting law enforcement officers forcing their way into the U.S. Capitol on both the west side and the east side of the building. Once inside, the subject's broke windows and doors, destroyed property, stole property, and assaulted federal police officers. Many of the federal police officers were injured, several were admitted to the hospital, and at least one federal police officer died as a result of the injuries he sustained. The subjects also confronted and terrorized members of Congress, Congressional staff, and the media. The subjects carried weapons including tire irons, sledgehammers, bear spray, and Tasers. They also took police equipment from overrun police including shields and police batons. At least one of the subjects carried a handgun with an extended magazine. These actions by the unknown individuals resulted in the disruption and ultimate delay of the vote Certification.

19.     Also, at approximately 2:30 p.m. EST, USCP ordered the evacuation of lawmakers, Vice President Mike Pence, and president pro tempore of the Senate, Charles Grassley, for their safety.

20.     At around 2:45 p.m. EST, subjects broke into the office of House Speaker Nancy Pelosi.

21.    At around 2:47 p.m., subjects broke into the United States Senate Chamber. Publicly available video shows an individual asking, "Where are they?" as they opened up the door to the Senate Chamber. Based upon the context, law enforcement believes that the word "they" is in reference to members of Congress.



22.    After subjects forced entry into the Senate Chamber, publicly available video shows that an individual asked, "Where the fuck is Nancy?" Based upon other comments and the context, law enforcement believes that the "Nancy" being referenced was the Speaker of the House of Representatives, Nancy Pelosi.



23.     An unknown subject left a note on the podium on the floor of the Senate Chamber.

This note, captured by the filming reporter, stated "A Matter of Time Justice is Coming."



24.     During the time when the subjects were inside the Capitol building, multiple

subjects were observed inside the US Capitol wearing what appears to be, based upon my training

and experience, tactical vests and carrying flex cuffs. Based upon my knowledge, training, and experience, I know that flex cuffs are a manner of restraint that are designed to be carried in situations where a large number of individuals were expected to be taken into custody.





25.    At around 2:48 p.m. EST, DC Mayor Muriel Bowser announced a citywide curfew beginning at 6:00 p.m.

26.    At around 2:45 p.m. EST, one subject was shot and killed while attempting to break into the House chamber through the broken windows.

27.    At about 3:25 p.m. EST, law enforcement officers cleared the Senate floor.

28.    Between 3:25 and around 6:30 p.m. EST, law enforcement was able to clear the U.S. Capitol of all of the subjects.

29.    Based on these events, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day. In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured. The proceedings resumed at approximately 8:00 pm after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

30.    Beginning around 8:00 p.m., the Senate resumed work on the Certification.

31.    Beginning around 9:00 p.m., the House resumed work on the Certification.

32.    Both chambers of Congress met and worked on the Certification within the Capitol building until approximately 3 a.m., on January 7, 2021.

33.    During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of

violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

34.     Based on my training and experience, I know that it is common for individuals to carry and use their cell phones during large gatherings, such as the gathering that occurred in the area of the U.S. Capitol on January 6, 2021. Such phones are typically carried at such gatherings to allow individuals to capture photographs and video footage of the gatherings, to communicate with other individuals about the gatherings, to coordinate with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

35.     Many subjects seen on news footage in the area of the U.S. Capitol are using a cell phone in some capacity. It appears some subjects were recording the events occurring in and around the U.S. Capitol and others appear to be taking photos, to include photos and video of themselves after breaking into the U.S. Capitol itself, including photos of themselves damaging and stealing property. As reported in the news media, others inside and immediately outside the U.S. Capitol live-streamed their activities, including those described above as well as statements about these activities.

36.     Photos below, available on various publicly available news, social media, and other media show some of the subjects within the U.S. Capitol during the riot. In several of these photos, the individuals who broke into the U.S. Capitol can be seen holding and using cell phones, including to take pictures and/or videos:

11





---

[1] https://losangeles.cbslocal.com/2021/01/06/congresswoman-capitol-building-takeover-an-attempted-coup/

[2] https://www.businessinsider.com/republicans-objecting-to-electoral-votes-in-congress-live-updates-2021-1.



***Facts Establishing Probable Cause to Search CAMARGO's Facebook and Instagram Accounts***

36.     On January 6, 2021, Witness 1, a former classmate and social media friend of CAMARGO, provided a tip to the FBI that Camargo had posted pictures and video content to CAMARGO's Instagram account under user account "Skilils" (CAMARGO'S INSTAGRAM ACCOUNT), as well as CAMARGO's Facebook account under uniform resource locator ("URL") "Facebook.com/sam.camargo.7" (CAMARGO'S FACBOOK ACCOUNT), evincing CAMARGO's participation in the rally and Capitol riot on January 6, 2021. Witness 1 provided the screenshot below, which appears to depict someone holding a piece of metal. The screenshot also includes superimposed text, reading, "Got some memorobioia, did it myself" [sic]. I have reviewed the publicly available posts on CAMARGO'S INSTAGRAM ACCOUNT and observed the same photograph below:

---

[3]https://www.thv11.com/article/news/arkansas-man-storms-capitol-pelosi/91-41abde60-a390-4a9e-b5f3-d80b0b96141e



37.    On January 7, 2021, Witness 1 informed me that a mutual friend of CAMARGO and Witness 1 ("Witness 2") was able to capture multiple "Instagram Stories"[4] (*i.e.*, short videos or images) that had been posted to, and then subsequently deleted from, CAMARGO'S INSTAGRAM ACCOUNT. Witness 2 emailed those videos and images (five silent videos and one still image) to me. The still image from the Instagram Stories series is the same image that Witness 1 initially provided to the FBI.

38.    Based on conversations with Witness 1 and Witness 2, as well as a review of the content itself, it appears that the videos and still image were taken by CAMARGO, on January 6, 2021, on or near U.S. Capitol grounds. Specifically, one video clip appears to have been taken at

---

[4] "Instagram Stories" is a feature within the Instagram application that allows users to post images and video content in a slideshow format. Instagram Stories allows users to add text, drawings, and emoticons to their images and video clips. Content posted as a Story is available for 24 hours and then deleted. It may also be proactively deleted before the 24-hour mark by the user. While Stories are automatically public, users can switch their profiles to private mode, which allows only approved followers to see their content. Because I was able to view publicly posted content on CAMARGO'S INSTAGRAM ACCOUNT, it appears that the account was set to allow all members of the public to view its profile content.

the bottom-level of the west-side steps to the U.S. Capitol building. The video shows a large crowd, with some of the participants perched on scaffolding that had been set up in preparation for Inauguration Day. Based on my training and experience, I know that this area is within the U.S. Capitol grounds. Another video clip shows what I believe to be CAMARGO's hand on a door handle to a door that appears to be an entry point into the U.S. Capitol building. U.S. Capitol Police officers appear to be standing at that door, attempting to keep members of the public from getting inside. Below is a screenshot from that video:



39.     The presence of the crowd, the distinctive door handle and door, and presence of what appears to be U.S. Capitol Police officers all support the conclusion that this video shows CAMARGO actively attempting to gain entrance to the U.S. Capitol building.

40.     On January 7, 2021, I reviewed all of the publicly available content on CAMARGO'S INSTAGRAM ACCOUNT and observed that the photograph of the individual holding the metal object, as well as the other videos from what appeared to be the Capitol riots, were no longer available for viewing. I also observed the following photograph, which appears to depict CAMARGO with an unidentified female:



41.    On January 7, 2021, I also reviewed the publicly available posts and information related to CAMARGO'S FACEBOOK ACCOUNT. I captured the following post, dated January 6, 2021:



42.    After reviewing the post above, I contacted CAMARGO, via a telephone number provided by Witness 1, for an interview. During the interview, CAMARGO admitted that he attended the protests in Washington, D.C., on January 6, 2021. He indicated that he had since

16

returned to Broward County, Florida. Then, CAMARGO became uncooperative and indicated that he had no information to provide to the FBI. A few hours after this interview, I observed the following post on CAMARGO'S FACEBOOK ACCOUNT, which appears to reference my conversation with CAMARGO:



43.     On January 20, 2021, I conducted opensource research on the Internet and located an individual named Samuel Pinho Camargom, as well as a date of birth and social security number associated with that individual. I also found a current address for Samuel Pinho Camargo in Hollywood, Florida, which is located in Broward County. With this information, I obtained Florida Department of Motor Vehicle records associated with Samuel Pinho Camargo, including the following driver's license photograph:



44.    I also obtained a police report, dated January 3, 2020, involving the same Samuel Pinho Camargo, from Hollywood Police Department in Florida. In the report, Samuel Pinho Camargo's address was listed as a residence in Hollywood, Florida.

45.    Finally, on January 14, 2021, I contacted Witness 1 and provided Witness 1 with the driver's license photograph depicted above. I asked whether Witness 1 recognized the person depicted in that photograph. Witness 1 explained that Witness 1 knew the person in the photograph to be CAMARGO, whom Witness 1 met in 2016, and last saw in 2017. When Witness 1 met CAMARGO, CAMARGO was living in Fort Myers, Florida. Witness 1 also provided a photograph that Witness 1 said was from CAMARGO'S FACEBOOK ACCOUNT page that showed CAMARGO's hand grabbing the door of the U.S. Capitol building. That photograph appeared to be the same photograph (depicted above) that was posted to CAMARGO'S INSTAGRAM ACCOUNT.

***Background Related to CAMARGO's Arrest and his Continued Use of Social Media***

46.    On January 15, 2021, a Complaint, charging CAMARGO with violations of 18 U.S.C. § 231(a)(3), 18 U.S.C. § 1752(a)(1) & (2), and 40 U.S.C. § 5104(e)(2)(D) and (G), and an Arrest Warrant, authorizing CAMARGO's arrest, were signed by Magistrate Judge G. Michael Harvey, in the United States District Court for the District of Columbia. Those charging documents

were unsealed, and the contents of those documents were published in mainstream media articles soon after filing.

47.     On January 19, 2020, when law enforcement in Florida sought to effect the Arrest Warrant and to execute a warrant to search CAMARGO's residence, CAMARGO was no longer there.

48.     On January 20, 2021, pursuant to an investigation into CAMARGO's whereabouts, CAMARGO was located, stopped, and arrested within the District of Columbia, where he was attempting to attend the Inauguration ceremonies of the President and Vice President of the United States. During an interview following his arrest, CAMARGO admitted to knowing about his pending charges and to returning to the District of Columbia for the ceremonies.

49.     Between January 7, 2021, and January 20, 2021, I continued to review the publicly available content associated with CAMARGO'S FACEBOOK ACCOUNT and CAMARGO'S INSTAGRAM ACCOUNT. I observed that CAMARGO remained active on both platforms during that time. Based on my training and experience, social media users typically use direct messaging functionality to communicate with others about their planned activities. Based on the evidence obtained thus far, it appears likely that CAMARGO used his social media accounts to make plans with others and to share his movements leading up to the Capitol riot on January 6, 2021, and thereafter. As a result, this warrant requests records from between January 1, 2021, and January 20, 2021.

**_Details Regarding the Subject Offenses:_**

50.     Based on the foregoing, your affiant submits that there is probable cause to believe that CAMARGO violated 18 U.S.C. § 231(a)(3), which makes it unlawful to commit or attempt to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer

lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function. For purposes of Section 231 of Title 18, a federally protected function means any function, operation, or action carried out, under the laws of the United States, by any department, agency, or instrumentality of the United States or by an officer or employee thereof. This includes the Joint Session of Congress, where the Senate and House count Electoral College votes.

51.     Your affiant submits that there is also probable cause to believe that CAMARGO violated 18 U.S.C. § 1752(a)(1) and (2), which make it a crime to (1) knowingly enter or remain in any restricted building or grounds without lawful authority to do; and (2) knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engage in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions. For purposes of Section 1752 of Title 18, a "restricted building" includes a posted, cordoned off, or otherwise restricted area of a building or grounds where the President of the United States or other person protected by the Secret Service, including the Vice President of the United States, is or will be temporarily visiting; or any building or grounds so restricted in conjunction with an event designated as a special event of national significance.

52.     Finally, your affiant submits there is probable cause to believe that CAMARGO violated 40 U.S.C. § 5104(e)(2)(D) and (G), which make it a crime to willfully and knowingly (D) utter loud, threatening, or abusive language, or engage in disorderly or disruptive conduct, at any

place in the Grounds or in any of the Capitol Buildings with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress, or the orderly conduct in that building of a hearing before, or any deliberations of, a committee of Congress or either House of Congress; and (G) parade, demonstrate, or picket in any of the Capitol Buildings.

## BACKGROUND CONCERNING PROVIDER'S ACCOUNTS

53.     PROVIDER is the provider of the internet-based accounts identified by "Facebook.com/sam.camargo.7" (CAMARGO'S FACEBOOK ACCOUNT) and "Skilils" (CAMARGO'S INSTAGRAM ACCOUNT).

### *Background Related to Facebook*

37.     PROVIDER owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com ("Facebook"). The website is owned and operated by PROVIDER. PROVIDER allows Facebook users to establish accounts with PROVIDER, and users can then use their Facebook accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

38.     PROVIDER asks users to provide basic contact and personal identifying information to PROVIDER, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. PROVIDER also assigns a user-identification number ("user ID") to each account. PROVIDER identifies unique Facebook accounts by a user's e-mail address, the user ID, or the username associated with a Facebook profile.

39.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. PROVIDER assigns a group identification number to each Facebook group. A Facebook user can also connect directly with individual Facebook users by sending each user a "friend" request. If the recipient of a "friend" request accepts the request, then the two users will become "friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "friends" and a "News Feed," which highlights information about the user's "friends," such as profile changes, upcoming events, and birthdays.

40.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook "friends" to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

41.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or

her "friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

42.    PROVIDER allows Facebook users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides Facebook users the ability to "tag" (*i.e.*, label) other Facebook users in a photo or video. When a user is "tagged" in a photo or video, he or she receives a notification of the "tag" and a link to see the photo or video. For PROVIDER's purposes, the photos and videos associated with a Facebook user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user "tagged" in them.

43.    Facebook users can exchange private messages on Facebook with other users. Those messages are stored by PROVIDER unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

44.    In general, user-generated content and information about the account (such as a user's photos, "status" updates, an activity log as described below, and the like) that is written using, stored on, sent from, or sent to a PROVIDER account can be indefinitely stored in connection with that account, unless the subscriber deletes the material. Further, such user-generated content can remain on PROVIDER's servers indefinitely if not deleted by the subscriber,

and even after being deleted, it may continue to be available on PROVIDER's servers for a certain period of time.

45. A Facebook user also can send other Facebook users a notification indicating that the recipient has been "poked". Facebook "pokes" enable Facebook users to get the attention of other Facebook users without delivering any user generated messages or other content.

46. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

47. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

48. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

49. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos in which the user has been "tagged", as well as connections made through the account, such as "liking" a Facebook page or adding someone as a "friend". The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

50. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

51. In addition to the applications described above, PROVIDER also provides Facebook users with access to thousands of other applications ("apps") on the Facebook platform.

When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

52.     PROVIDER also retains Internet Protocol ("IP") logs for a given Facebook user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile and would show when and from what IP address the user did so.

53.     Depending on the user's privacy settings, PROVIDER may also obtain and store the physical location of the user's device(s), including Global Positioning System ("GPS") data, as the user interacts with the Facebook service on those device(s).

54.     Social networking providers like PROVIDER typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with PROVIDER about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like PROVIDER typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

55.     Based on my training and experience, I know that providers such as PROVIDER also collect information relating to the devices used to access a subscriber's account – such as laptop or desktop computers, cell phones, and tablet computers. Such devices can be identified in

various ways. For example, some identifiers are assigned to a device by the manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a particular user account for cellular data or voice services, and some identifiers are actually assigned by PROVIDER in order to track what devices are using PROVIDER's accounts and services. Examples of these identifiers include unique application number, hardware model, operating system version, Global Unique Identifier ("GUID"), device serial number, mobile network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI"). Based on my training and experience, I know that such identifiers may constitute evidence of the crimes under investigation because they can be used (a) to find other PROVIDER accounts created or accessed by the same device and likely belonging to the same user, (b) to find other types of accounts linked to the same device and user, and (c) to determine whether a particular device recovered during course of the investigation was used to access the PROVIDER account.

56.     PROVIDER also allows its subscribers to access its various services through an application that can be installed on and accessed via cellular telephones and other mobile devices. This application is associated with the subscriber's PROVIDER account. In my training and experience, I have learned that when the user of a mobile application installs and launches the application on a device (such as a cellular telephone), the application directs the device in question to obtain a Push Token, a unique identifier that allows the provider associated with the application (such as PROVIDER) to locate the device on which the application is installed. After the applicable push notification service (*e.g.*, Apple Push Notifications (APN) or Google Cloud Messaging) sends a Push Token to the device, the Token is then sent to the application, which in turn sends the Push Token to the application's server/provider. Thereafter, whenever the provider needs to send

notifications to the user's device, it sends both the Push Token and the payload associated with the notification (*i.e.*, the substance of what needs to be sent by the application to the device). To ensure this process works, Push Tokens associated with a subscriber's account are stored on the provider's server(s). Accordingly, the computers of PROVIDER are likely to contain useful information that may help to identify the specific device(s) used by a particular subscriber to access the subscriber's PROVIDER account via the mobile application.

57.     Based on my training and experience, I know that providers such as PROVIDER use cookies and similar technologies to track users visiting PROVIDER's webpages and using its products and services. Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer. When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before. This sort of technology can be used to track users across multiple websites and online services belonging to PROVIDER. More sophisticated cookie technology can be used to identify users across devices and web browsers. From training and experience, I know that cookies and similar technology used by providers such as PROVIDER may constitute evidence of the criminal activity under investigation. By linking various accounts, devices, and online activity to the same user or users, cookies and linked information can help identify who was using a PROVIDER account and determine the scope of criminal activity.

58.     Based on my training and experience, I know that PROVIDER maintains records that can link different PROVIDER accounts to one another, by virtue of common identifiers, such as common e-mail addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group of persons, used multiple PROVIDER accounts. Based on my training and experience, I also know

that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular PROVIDER account.

59.    Based on my training and experience, I know that subscribers can communicate directly with PROVIDER about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Providers such as PROVIDER typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

60.    In summary, based on my training and experience in this context, I believe that the computers of PROVIDER are likely to contain user-generated content such as stored electronic communications (including retrieved and unretrieved messages for PROVIDER subscribers), as well as PROVIDER-generated information about its subscribers and their use of PROVIDER services and other online services. In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. In fact, even if subscribers provide PROVIDER with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

***Background Related to Instagram***

61.    Instagram is a service owned by PROVIDER. Specifically, Instagram is a free-access social networking service, accessible through its website and its mobile application, that allows subscribers to acquire and use Instagram accounts, like CAMARGO'S INSTAGRAM

ACCOUNT, through which users can share messages, multimedia, and other information with other Instagram users and the general public.

62.     As is the case with Facebook profile setup, PROVIDER requires potential users of Instagram to submit basic contact and personal identifying information during the Instagram registration process. This information, which can later be changed by the user, may include the user's full name, birth date, gender, contact e-mail addresses, physical address, telephone numbers, credit card or bank account number, and other personal identifiers. Facebook keeps records of changes made to this information.

63.     PROVIDER also collects and retains information about how each user accesses and uses Instagram. This includes information about the IP addresses used to create and use an account, unique identifiers and other information about devices and web browsers used to access an account, and session times and durations.

64.     Each Instagram account is identified by a unique username chosen by the user. Users can change their usernames whenever they choose but no two users can have the same usernames at the same time. Instagram users can create multiple accounts and, if "added" to the primary account, can switch between the associated accounts on a device without having to repeatedly log-in and log-out.

65.     Instagram users can also connect their Instagram and Facebook accounts to utilize certain cross-platform features, and multiple Instagram accounts can be connected to a single Facebook account. Instagram accounts can also be connected to certain third-party websites and mobile apps for similar functionality. For example, an Instagram user can "tweet" an image uploaded to Instagram to a connected Twitter account or post it to a connected Facebook account, or transfer an image from Instagram to a connected image printing service. Facebook maintains

records of changed Instagram usernames, associated Instagram accounts, and previous and current connections with accounts on Facebook and third-party websites and mobile apps.

66.     Instagram users can "follow" other users to receive updates about their posts and to gain access that might otherwise be restricted by privacy settings (for example, users can choose whether their posts are visible to anyone or only to their followers). Users can also "block" other users from viewing their posts and searching for their account, "mute" users to avoid seeing their posts, and "restrict" users to hide certain activity and prescreen their comments. Instagram also allows users to create a "close friends list" for targeting certain communications and activities to a subset of followers.

67.     Users have several ways to search for friends and associates to follow on Instagram, such as by allowing Facebook to access the contact lists on their devices to identify which contacts are Instagram users. PROVIDER retains this contact data unless deleted by the user and periodically syncs with the user's devices to capture changes and additions. Users can similarly allow PROVIDER to search an associated Facebook account for friends who are also Instagram users. Users can also manually search for friends or associates.

68.     Each Instagram user has a profile page where certain content they create and share ("posts") can be viewed either by the general public or only the user's followers, depending on privacy settings. Users can customize their profile by adding their name, a photo, a short biography ("Bio"), and a website address.

69.     One of Instagram's primary features is the ability to create, edit, share, and interact with photos and short videos. Users can upload photos or videos taken with or stored on their devices, to which they can apply filters and other visual effects, add a caption, enter the usernames of other users ("tag"), or add a location. These appear as posts on the user's profile. Users can

remove posts from their profiles by deleting or archiving them. Archived posts can be reposted because, unlike deleted posts, they remain on Facebook's servers.

70.    Users can interact with posts by liking them, adding or replying to comments, or sharing them within or outside of Instagram. Users receive notification when they are tagged in a post by its creator or mentioned in a comment (users can "mention" others by adding their username to a comment followed by "@"). An Instagram post created by one user may appear on the profiles or feeds of other users depending on a number of factors, including privacy settings and which users were tagged or mentioned.

71.    As previously explained above, an Instagram "story" is similar to a post but can be viewed by other users for only 24 hours. Stories are automatically saved to the creator's "Stories Archive" and remain on PROVIDER's servers unless manually deleted. The usernames of those who viewed a story are visible to the story's creator until 48 hours after the story was posted.

72.    Instagram allows users to broadcast live video from their profiles. Viewers can like and add comments to the video while it is live, but the video and any user interactions are removed from Instagram upon completion unless the creator chooses to send the video to IGTV, Instagram's long-form video app.

73.    Instagram Direct, Instagram's messaging service, allows users to send private messages to select individuals or groups. These messages may include text, photos, videos, posts, videos, profiles, and other information. Participants to a group conversation can name the group and send invitations to others to join. Instagram users can send individual or group messages with "disappearing" photos or videos that can only be viewed by recipients once or twice, depending on settings. Senders can't view their disappearing messages after they are sent but do have access to each message's status, which indicates whether it was delivered, opened, or replayed, and if the

recipient took a screenshot. Instagram Direct also enables users to video chat with each other directly or in groups.

74.      Instagram offers services such as Instagram Checkout and Facebook Pay for users to make purchases, donate money, and conduct other financial transactions within the Instagram platform, as well as on Facebook and other associated websites and apps. Instagram collects and retains payment information, billing records, and transactional and other information when these services are utilized.

75.      Instagram has a search function which allows users to search for accounts by username, user activity by location, and user activity by hashtag. Hashtags, which are topical words or phrases preceded by a hash sign (#), can be added to posts to make them more easily searchable and can be "followed" to generate related updates from Instagram. Facebook retains records of a user's search history and followed hashtags.

76.      PROVIDER collects and retains location information relating to the use of an Instagram account, including user-entered location tags and location information used by PROVIDER to personalize and target advertisements.

77.      PROVIDER uses information it gathers from its platforms and other sources about the demographics, interests, actions, and connections of its users to select and personalize ads, offers, and other sponsored content. PROVIDER maintains related records for Instagram users, including information about their perceived ad topic preferences, interactions with ads, and advertising identifiers. This data can provide insights into a user's identity and activities, and it can also reveal potential sources of additional evidence.

78.      In some cases, Instagram users may communicate directly with PROVIDER about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from

other users. Social networking providers like PROVIDER typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

79.     For each Instagram user, PROVIDER collects and retains the content and other records described above, sometimes even after it is changed by the user (including usernames, phone numbers, email addresses, full names, privacy settings, email addresses, and profile bios and links).

***Evidence Likely to be Contained within CAMARGO'S FACEBOOK ACCOUNT and CAMARGO'S INSTAGRAM ACCOUNT***

80.     In my training and experience, evidence of who was using Facebook and/or Instagram and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

81.     For example, the stored communications and files connected to an Instagram account may provide direct evidence of the offenses under investigation. Based on my training and experience, direct messages, emails, voicemails, photographs, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

82.     In addition, the user's account activity, logs, stored electronic communications, and other data retained by PROVIDER can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a

search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geolocation, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

83.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (*e.g.*, information indicating a plan to commit a crime), or consciousness of guilt (*e.g.*, deleting account information in an effort to conceal evidence from law enforcement).

84.     Other information connected to the use of Facebook and Instagram may lead to the discovery of additional evidence. For example, messages, location information, and other data associated with CAMARGO'S INSTAGRAM ACCOUNT and CAMARGO'S FACEBOOK ACCOUNT will likely amount to evidence of CAMARGO's state of mind leading up to and during the Capitol riots. This evidence is relevant and material to establishing CAMARGO's knowledge and intent on January 6, 2021.

85.     Therefore, PROVIDER's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Facebook and Instagram. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## REQUEST TO SUBMIT WARRANT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

86.     I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant. I submit that Assistant U.S. Attorney Jeffrey Poulin, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

## CONCLUSION

87.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on PROVIDER, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

Michael Attard
Special Agent
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone this 24th day of January 2021.

G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE

<u>**CERTIFICATE OF AUTHENTICITY OF DOMESTIC**</u>
<u>**RECORDS PURSUANT TO FEDERAL RULES OF**</u>
<u>**EVIDENCE 902(11) AND 902(13)**</u>

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Facebook, Inc. ("PROVIDER"), and my title is _____. I am a custodian of records for PROVIDER, and I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of PROVIDER. The attached records consist of:

_____

[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]

I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of PROVIDER, and they were made by PROVIDER as a regular practice; and

b.      such records were generated by PROVIDER's electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of PROVIDER in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by PROVIDER, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____          _____
Date                                                          Signature